56



**UNSEALED**

\* 6/15/15 DMR
\*\* 6/16/15

United States District Court
Southern District of Texas
FILED

JUN 0 9 2015

David J. Bradley, Clerk

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### McALLEN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | § | | |
| | § | | |
| v. | § | Criminal No. | **M-15-76 2** |
| | § | | |
| \* RICARDO MENDEZ | § | | |
| \*\* ERMIT MARIE DE LA TORRE | § | | |
| also known as Ermith De La Torre | § | | |
| also known as Ermith Marie De La Torre | § | | |

### SEALED INDICTMENT

**THE GRAND JURY CHARGES:**

At all times material to this Indictment:

### THE MEDICARE PROGRAM

1.     The Medicare Program ("Medicare") was a federal health care benefit program signed into law in 1965, as Title XVIII of the Social Security Act, for the purpose of providing federal funds to pay for certain specified medical benefits, items, or services (hereinafter referred to as "medical services") furnished to individuals who were over the age of 65, blind, disabled, and who were qualified and enrolled as Medicare beneficiaries.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.   Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

2.     The Medicare program consisted of multiple parts, including, Part A (Hospital Insurance), Part B (Medical Insurance), and Part D (Prescription Drug Coverage).   Part A helped cover inpatient care in hospitals, including critical access hospitals, and some skilled nursing facilities.   It also helped cover hospice care and some home health care services.   Part B helped pay for certain physician services, outpatient services, medical equipment, etc.

Part B helped pay for covered benefits when they were medically necessary and when the Medicare beneficiaries met certain conditions. Part D helped cover the costs of prescription drugs.

3.     Medicare assigned every person qualified and enrolled as a Medicare beneficiary a unique personal Medicare identification number known as a Health Insurance Claim Number, often referred to as a ("HICN").

4.     Medicare funds were intended to pay for medical services furnished to Medicare beneficiaries by enrolled Medicare providers and suppliers when such medical services were furnished in accordance with all of the rules, regulations, and laws which governed the Medicare program. There was no significant difference between the terms "provider" and "supplier", and the term "provider" will be used herein.

5.     A person or entity that desired to become a Medicare provider was required to submit an application, and sign an agreement, which included a promise to comply with all Medicare related laws and regulations. Medicare assigned a unique "National Provider Identifier" (NPI) to each approved Medicare provider. A person or entity with an NPI could file claims, also known as bills, with Medicare to obtain reimbursement for covered medical services which were furnished to Medicare beneficiaries in accordance with the rules, regulations, and laws pertaining to the Medicare program. The Medicare Provider Manual, bulletins, and newsletters distributed and available to all Medicare providers, and to the public, contained the rules and regulations pertaining to Medicare-covered medical services and instructions on how to appropriately bill for medical services furnished to Medicare beneficiaries. The Medicare rules and regulations were published in various forms and made available to all Medicare providers and to the public.

2

6.     CMS contracted with private contractors, typically insurance companies, to provide certain administrative services for Medicare, such as provider enrollment, claims processing and payment.  A contractor that provided administrative services under Part B of Medicare was sometimes referred to as a "carrier."

7.     In order to receive reimbursement from Medicare for medical services to beneficiaries, Medicare providers submitted, or caused the submission of claims to a Medicare carrier.  Claims could have been submitted either directly by the provider, or through a billing company selected by the Medicare provider.  Claims could have been submitted either in paper form or electronically.  Medicare providers could only submit claims on, or after, the "date of service" to the beneficiary.  Although Medicare providers may have sometimes submitted claims in groups for efficiency, every claim was considered individually.

8.     Medicare providers were required to submit their Medicare claims on either a standardized form commonly referred to as a "Form 1500", "HCF 1500", or "CMS 1500" or as an electronic claims submission.   Certain specific information was required to be on each claim form or claims submission, including but not limited to the following:

      a.     the beneficiary's name and unique personal Medicare identification number (HICN);

      b.     the date of service;

      c.     the specific uniform code for the diagnosis of, or nature of, the Medicare beneficiary's illness, injury, or condition;

      d.     the specific uniform national Healthcare Common Procedure Coding System (HCPCS) code established by CMS to define and describe the services for which payment was sought;

3

      e.     the name and unique physician identification number ("UPIN") or national provider identifier ("NPI") of the physician who prescribed or ordered the services for which payment was sought;

      f.      the provider's MPI number; and

      g.     all applicable modifier codes.

9.     The Current Procedural Terminology (CPT) code set is a medical code set maintained by the American Medical Association and describes medical, surgical, and diagnostic services and was designed to communicate uniform information about medical services and procedures. Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted. The volume of documentation should not be the primary influence upon which a specific level of service is billed. Documentation should support the level of service reported. The service should be documented during, or as soon as practicable after it is provided in order to maintain an accurate medical record.

10.    For each claim submitted, the Medicare provider certified, among other things, that: (a) the information on the claim form was true, accurate, and complete; (b) the medical services had been provided to the Medicare beneficiary; and (c) the medical services listed on the claim were medically indicated and necessary to the health of the Medicare beneficiary.

11.    Claims to Medicare were paid either by paper check delivered by the United States Postal Service or by wire or radio transmissions, in transactions known as electronic funds transfers.

## THE TEXAS MEDICAID PROGRAM

12.     The federal Medical Assistance program (commonly known as the Medicaid program), was a federal health care benefit program signed into law in 1965, as Title XIX of the Social Security Act, for the purpose of providing joint state and federal funds to pay for medical benefits items or medical services furnished to individuals of low income who were qualified and enrolled as Medicaid beneficiaries.   States desiring to participate in, and receive funding from, the federal Medicaid program were required to develop a "state plan" for medical assistance and obtain approval of the plan from the United States Department of Health and Human Services.   Upon approval of its state plan, each individual state administered its own Medicaid program, subject to the requirements of the state plan, the Social Security Act, the United States Department of Health and Human Services and all other applicable state and federal laws.

13.     The Texas Medical Assistance Program also known as the Texas Medicaid program (herein after referred to as "Texas Medicaid"), was implemented under the provisions of Title XIX of the federal Social Security Act and Chapter 32 of the Texas Human Resources Code, for the purpose of providing joint state and federal funds to pay for medical benefits items or medical services furnished to individuals of low income who were qualified and enrolled as Texas Medicaid beneficiaries.   Texas Medicaid was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

14.     Texas Medicaid assigned every person qualified and enrolled as a Texas Medicaid beneficiary a unique personal Texas Medicaid identification number known as a Patient Control Number ("PCN").

5

15.    The Texas governmental agency known as the Health and Human Services Commission ("HHSC") was the single state Medicaid agency in Texas responsible, subject to oversight by the federal government, for administering the Texas Medicaid program at the state level.  Federal funding was only available to the Texas Medicaid program as long as the Texas Medicaid program complied with the terms and requirements of the state plan, the Social Security Act, the United States Department of Health and Human Services, and all other applicable state and federal laws, and with the rules and regulations established by both the federal government and the State of Texas pertaining to Texas Medicaid.

16.    The Texas Medicaid & Healthcare Partnership (hereinafter referred to as "TMHP") was under contract with HHSC to provide certain administrative functions such as provider enrollment, claims processing and payment, and publishing the Texas Medicaid Provider Procedures Manual which contained the rules and regulations of the Texas Medicaid program established by the state plan and by HHSC.

17.    Texas Medicaid funds were intended to pay for covered medical services furnished to Texas Medicaid beneficiaries, by enrolled Texas Medicaid providers, when such medical services were furnished in accordance with all of the rules, regulations, and laws which governed Texas Medicaid; and for crossover claims (i.e. claims involving both Medicare and Texas Medicaid), when the medical services were also furnished in accordance with all of the rules, regulations, and laws which governed Medicare.

18.    A person or entity that desired to become a Texas Medicaid provider was required to submit an application and sign an agreement which included a promise to comply with all Texas Medicaid related laws and regulations.  Texas Medicaid assigned a unique Texas Provider Identifier ("TPI") number to each approved Texas Medicaid provider.

6

A person or entity with a TPI number could file claims, also known as bills, with Texas Medicaid to obtain reimbursement for covered medical services which were furnished to Texas Medicaid beneficiaries in accordance with the rules, regulations, and laws pertaining to the Medicaid program; and for crossover claims described in paragraph 19 below, when the medical services were also furnished in accordance with all of the rules, regulations, and laws which governed Medicare.

19.     An individual who was a beneficiary under both Medicare and Texas Medicaid was sometimes referred to as a "dual-eligible beneficiary."   When a service provided to a dual-eligible beneficiary was a benefit of both Medicare and Texas Medicaid, the Medicare provider was required to submit claims with Medicare first.   After Medicare paid the allowed amount of the claim (usually 80 percent), the remaining balance was automatically submitted to Texas Medicaid for payment as what was generally referred to as a "crossover claim."   Texas Medicaid paid crossover claims only if Medicare had paid first, and only if the provider had followed all of the rules, regulations, and laws which governed both Medicare, and Texas Medicaid.

20.     Texas Medicaid would only pay reimbursement for medical services, which were medically necessary to the treatment of the beneficiary's illness, injury, or condition.

21.     To receive reimbursement from Texas Medicaid for medical services to beneficiaries, Texas Medicaid providers submitted or caused the submission of claims to Texas Medicaid, either directly or through a billing company.   Claims could be submitted either in paper form or electronically.   Texas Medicaid providers could only submit claims on or after the "date of service" to the beneficiary.   Although Texas Medicaid providers may have sometimes submitted claims in groups for efficiency, every claim was considered individually.

7

22.     Texas Medicaid providers were required to submit their Texas Medicaid claims on a standardized form commonly referred to as a "Form1500", "HCF 1500", or "CMS 1500" or as an electronic claims submission.   Certain specific information was required to be on each claim form or claims submission, including but not limited to the following:

    a.     the beneficiary's name and unique personal Texas Medicaid identification number (PCN);

    b.     the date of service;

    c.     the specific uniform code for the diagnosis of, or nature of, the Texas Medicaid beneficiary's illness, injury, or condition;

    d.     the specific uniform national Healthcare Common Procedure Coding System (HCPCS) code established by CMS to define and describe the services for which payment was sought;

    e.     the name and unique physician identification number ("UPIN") or national provider identifier ("NPI") of the physician who prescribed or ordered the services for which payment was sought;

    f.     the provider's TPI number; and

    g.     all applicable modifier codes.

23.     For each claim submitted, the Texas Medicaid provider certified, among other things, that: (a) the information on the claim form was true, accurate, and complete; (b) the medical services had been provided to the Texas Medicaid beneficiary; and (c) the medical services listed on the claim were medically indicated and necessary to the health of the Texas Medicaid beneficiary.   Texas Medicaid service providers are required to certify compliance with or agree to various state and federal laws and regulations.   After submitting a signed claimed to TMHP, the provider certifies the following: services were personally rendered by the billing provider or under supervision of the billing provider, if allowed for that provider type, or under the substitute physician arrangement.

8

24.    A provider delegating signatory authority to a member of the office staff or to a billing service remains responsible for the accuracy of all information on a claim submitted for payment.   A provider's employees or a billing service and its employees are equally responsible for any false billings in which they participated or directed.

25.    Claims to Texas Medicaid were paid either by paper check delivered by the United States Postal Service or by wire or radio transmissions, in transactions known as electronic funds transfers.

### PHYSICIAN AND NON-PHYSICIAN SERVICES

26.    Physician services are the professional services performed by a physician or physicians for a patient including diagnosis, therapy, surgery, consultation, and care plan oversight.

27.    Physician services that are paid for by Medicare and Texas Medicaid include those reasonable and medically necessary services ordered and performed by a physician or under a physician's personal supervision that are within the scope of the practice of their profession as defined by state law. Accordingly, for each encounter, a physician must examine the patient, confirm or revise the diagnosis of record, confirm or revise the plan of care, and document those tasks in the appropriate medical records for the beneficiary before submitting claims. This documentation is part of the patient's medical record and must be retained by the provider for a period of not less than five (5) years.

28.    Professional services are those face-to-face services rendered by physicians and other health care professionals who may report evaluation and management services reported by a specific CPT code.

29.    Medicare paid for evaluation and management services for specific non-physician practitioners (i.e., nurse practitioner, clinical nurse specialist, and certified nurse midwife) whose Medicare benefit permits them to bill these services. A physician assistant (PA) may also provide a physician service, however, the physician collaboration and general supervision rules as well as all billing rules apply to all the above non-physician practitioners. The service provided must be medically necessary and the service must be within the scope of practice for a non-physician practitioner in the state in which he/she practices.

30.    A non-physician practitioner such as a physician assistant or a nurse practitioner may be licensed under state law to perform a specific medical procedure and may be able to perform the procedure without physician supervision and have the service covered and paid for by Medicare as a physician assistant's or nurse practitioner's service.

31.    The services of a nurse practitioner may be covered if they are performed in collaboration with a medical doctor/doctor of osteopathy ("MD/DO").   Collaboration is a process in which a nurse practitioner works with one or more physicians to deliver health care services, with medical direction and appropriate supervision as required by the law of the state in which the services are furnished.   In the absence of state law governing collaboration, collaboration is to be evidenced by nurse practitioners documenting their scope of practice and indicating the relationships they have with physicians to deal with issues outside their scope of practice.

## PALM VILLAGE FAMILY CLINIC AND THE DEFENDANTS

32.     Defendant RICARDO MENDEZ, was a resident of Hidalgo County, Texas and was licensed as a nurse practitioner in the state of Texas with an advanced practice registered nurse (APRN) # AP120245, a registered nurse (RN) license # 534126, a Drug Enforcement Administration (DEA) registration # MM2548191, and Department of Public Safety (DPS) registration # 20185819.   National Provider Identifier (NPI) # 1841371515 was assigned to Defendant MENDEZ.

33.     On or about January 9, 2012, Defendant MENDEZ became enrolled as a provider in the Texas Medicaid program and was assigned Texas Provider Identifier (TPI) # 2860173.

34.     Defendant MENDEZ was the sole owner of Palm Village Family Clinic LLC in Penitas, Texas.

35.     On or about January 13, 2014, Defendant MENDEZ, on behalf of Palm Village Family Clinic LLC, became enrolled as a provider in the Medicare program.   National Provider Identifier (NPI) # 1396171344 and Medicare ID # 328028 were assigned to Palm Village Family Clinic LLC.

36.     On or about July 15, 2014, Defendant MENDEZ, on behalf of Palm Village Family Clinic LLC, became enrolled as a provider in the Texas Medicaid program.   Texas Provider Identifier (TPI) # 3329294 was assigned to Palm Village Family Clinic LLC.

37.     Palm Village Family Clinic ostensibly provided medical services to Medicare and Texas Medicaid beneficiaries (hereinafter referred to as beneficiaries) as well as to private insurance and cash pay patients in Hidalgo County.

38.     Defendant ERMIT MARIE DE LA TORRE (also known as Ermith De La Torre or Ermith Marie De La Torre) was a resident of Hidalgo County and was an employee at Palm Village Family Clinic.   Defendant DE LA TORRE was not a licensed medical professional in the state of Texas or any other state.

## MEDICARE AND TEXAS MEDICAID BILLINGS AND PAYMENTS

39.     From on or about August 1, 2014 through on or about March 16, 2015, the defendants submitted or caused others to submit false or fraudulent claims in the approximate aggregate sum of $49,235.22 to Medicare and Texas Medicaid, for services which were not provided or were not properly provided by a qualified, licensed individual to Medicare and Texas Medicaid beneficiaries.   As a result of said false and fraudulent claims, Medicare and Texas Medicaid paid the approximate aggregate sum of $14,333.23.

## COUNT ONE
## CONSPIRACY TO COMMIT HEALTH CARE FRAUD

40.     The Grand Jury incorporates by reference paragraphs 1 through 39 as though fully restated and re-alleged herein.

41.     Beginning on or about August 1, 2014 through on or about March 16, 2015, in the McAllen Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the exact dates being unknown to the Grand Jury, defendants,

**RICARDO MENDEZ**
**and**
**ERMIT MARIE DE LA TORRE**
**also known as Ermith De La Torre**
**also known as Ermith Marie De La Torre**

did conspire and agree together, with each other, and with other persons known and unknown to the Grand Jury, to knowingly and willfully, in violation of Title 18, United States Code, Section 1347, execute a scheme and artifice to defraud the health care benefit programs known as Medicare and Texas Medicaid or to obtain, by false or fraudulent pretenses, representations, or promises, any of the money and or property owned by or under the control of said health care benefit program in connection with the delivery of, or payment for, health care benefits, items, and medical services.

All in violation of Title 18, United States Code, Section 1349.

## OBJECT OF CONSPIRACY

42.    The object and purpose of the conspiracy and scheme was to defraud the health care benefit programs known as Medicare and Texas Medicaid, and to obtain by false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of the health care benefit programs known as Medicare and Texas Medicaid, in connection with the delivery of, or payment for, health care benefits, items, or medical services.

## MANNER AND MEANS

43.    In order to execute and carry out their illegal activities, the defendants committed the following acts:

13

(a)    Defendants knowingly submitted or caused others to submit claims with Medicare and Texas Medicaid for reimbursement of services that were provided by an unlicensed, unqualified individual.  The defendants filed or caused others to file the claims with Medicare and Texas Medicaid knowing that said claims were false and fraudulent, since the services were provided by an individual who was not licensed as a medical professional in the state of Texas or any other state.

(b)    Defendant De La Torre examined, assessed, and/or treated patients without the assistance or supervision of any licensed medical professional.  Specifically, Defendant De La Torre performed medical procedures, including pelvic examinations, pap smears, and male genitalia examinations, without any assistance or supervision from a physician, nurse, or other licensed medical professional. Defendant De La Torre performed checkups on infants and minor children without any assistance or supervision from a physician, nurse, or other licensed medical professional.

(c)    Defendant De La Torre prescribed medication to patients from a pre-signed prescription pad.  Defendant Mendez illegally supplied Defendant De La Torre with blank prescriptions containing only his signature prior to Defendant De La Torre meeting with patients.  Defendant De La Torre prescribed medication from the pre-signed prescriptions after examining and assessing patients without any assistance from Defendant Mendez or any licensed medical professional.  Patients subsequently had these prescriptions filled in reliance on the defendants' actions.

(d)    Defendant Mendez, knowing that Defendant De La Torre was not a licensed medical professional, referred to Defendant De La Torre as "la doctora" (Spanish translation for female doctor or physician) in the presence of patients and employees at Palm Village Family Clinic.  Defendant De La Torre, knowing that she was not a license medical professional, held herself out as "la doctora" to patients.  Defendant Mendez knowingly submitted or caused others to submit claims to Medicare and Texas Medicaid for services provided by Defendant De La Torre as if the services had been performed by a qualified, licensed medical professional.

(e)    During and in relation to their fraudulent conduct and to further their scheme and artifice to defraud Medicare and Texas Medicaid, the defendants knowingly transferred, possessed, or used or knowingly caused others to transfer, possess, or use, without lawful authority, one or more means of identification of Texas Medicaid beneficiaries which they used to execute their scheme and artifice to commit health care fraud.

## **ACTS IN FURTHERANCE OF CONSPIRACY**

44.    See Counts 2-11 (paragraph 46) below.

## COUNTS TWO THROUGH ELEVEN
## HEALTH CARE FRAUD

45.     The Grand Jury incorporates by reference paragraphs 1 through 39 and paragraph 43 as though fully restated and re-alleged herein.

46.     Beginning on or about August 1, 2014 through on or about March 16, 2015, in the McAllen Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the exact dates being unknown to the Grand Jury, defendants,

**RICARDO MENDEZ**
**and**
**ERMIT MARIE DE LA TORRE**
**also known as Ermith De La Torre**
**also known as Ermith Marie De La Torre**

aiding and abetting one another, did knowingly and willfully execute or attempt to execute a scheme or artifice to defraud the health care benefit programs known as Medicare and Texas Medicaid, or to obtain by false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of the health care benefit programs known as Medicare and Texas Medicaid, in connection with the delivery of, or payment for, health care benefits, items, or services.   Defendants submitted, aided, abetted, counseled, commanded, induced, procured or otherwise facilitated or caused each other and others to submit false and fraudulent claims to Medicare and Texas Medicaid, for medical benefits, items, and services which were not provided or not properly provided, including, but not limited to the following:

| Count | Patient | Date of Alleged Service (On or about) | Date Billed (On or about) | Amount Billed | Reason Claim Was False and Fraudulent |
|---|---|---|---|---|---|
| 2 | M.M. | 12/16/14 | 12/18/14 | $85.00 | Patient was examined, assessed, treated, and prescribed medication by an unqualified, unlicensed individual. Service was subsequently billed as if provided by a qualified, licensed professional. |
| 3 | A.H. | 12/16/14 | 12/18/14 | $85.00 | Patient was examined, assessed, treated, and prescribed medication by an unqualified, unlicensed individual. Service was subsequently billed as if provided by a qualified, licensed professional. |
| 4 | S.P. | 1/16/15 | 1/19/15 | $300.00 | Patient was examined, assessed, and treated by an unqualified, unlicensed individual. Service was subsequently billed as if provided by a qualified, licensed professional. |
| 5 | A.D. | 2/2/15 | 2/9/15 | $85.00 | Patient was examined, assessed, treated, and prescribed medication by an unqualified, unlicensed individual. Service was subsequently billed as if provided by a qualified, licensed professional. |
| 6 | A.L. | 2/2/15 | 2/9/15 | $85.00 | Patient was examined, assessed, and treated by an unqualified, unlicensed individual. Service was subsequently billed as if provided by a qualified, licensed professional. |
| 7 | J.L. | 2/2/15 | 2/9/15 | $85.00 | Patient was examined, assessed, treated, and prescribed medication by an unqualified, unlicensed individual. Service was subsequently billed as if provided by a qualified, licensed professional. |
| 8 | M.L. | 2/2/15 | 2/9/15 | $100.00 | Patient was examined, assessed, and treated by an unqualified, unlicensed individual. Service was subsequently billed as if provided by a qualified, licensed professional. |

| Count | Patient | Date of Alleged Service (On or about) | Date Billed (On or about) | Amount Billed | Reason Claim Was False and Fraudulent |
|-------|---------|----------------------------------------|---------------------------|---------------|----------------------------------------|
| 9 | E.R. | 2/2/15 | 2/9/15 | $85.00 | Patient was examined, assessed, treated, and prescribed medication by an unqualified, unlicensed individual. Service was subsequently billed as if provided by a qualified, licensed professional. |
| 10 | G.R. | 2/2/15 | 2/9/15 | $85.00 | Patient was examined, assessed, treated, and prescribed medication by an unqualified, unlicensed individual. Service was subsequently billed as if provided by a qualified, licensed professional. |
| 11 | E.M. | 2/4/15 | 2/9/15 | $85.00 | Patient was examined, assessed, treated, and prescribed medication by an unqualified, unlicensed individual. Service was subsequently billed as if provided by a qualified, licensed professional. |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS TWELVE THROUGH FOURTEEN
## AGGRAVATED IDENTITY THEFT

47.     The Grand Jury incorporates by reference paragraphs 1 through 39 and paragraph 43 as though fully restated and re-alleged herein.

48.     Beginning on or about August 1, 2014 through to on or about March 16, 2015, in the McAllen Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the exact dates being unknown to the Grand Jury, defendants,

17

**RICARDO MENDEZ**
**and**
**ERMIT MARIE DE LA TORRE**
**also known as Ermith De La Torre**
**also known as Ermith Marie De La Torre**

during and in relation to a felony violation of Title 18, United States Code, Section 1347, Health

Care Fraud, aiding and abetting one another, did knowingly transfer, possess, or use, without

lawful authority, a means of identification of another person, including but not limited to the

following:

| Count | Patient | Date of Alleged Service (On or about) | Date Billed (On or About) | Amount Billed | Reason Claim Was False and Fraudulent | Means of ID Used Without Lawful Authority on False and Fraudulent Claim |
|---|---|---|---|---|---|---|
| 12 | A.H. | 12/16/14 | 12/18/14 | $85.00 | See Count 3 | Patient's identifying information and/or Medicaid Number |
| 13 | M.L. | 2/2/15 | 2/9/15 | $100.00 | See Count 8 | Patient's identifying information and/or Medicaid Number |
| 14 | G.R | 2/2/15 | 2/9/15 | $85.00 | See Count 10 | Patient's identifying information and/or Medicaid Number |

All in violation of Title 18, United States Code, Sections 1028A and 2.

A TRUE BILL

_____
FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

_____
ASSISTANT UNITED STATES ATTORNEY